IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 12-30035 |
| | ) | |
| VERNON KLINEFELTER and | ) | |
| GERALDINE KLINEFELTER, | ) | |
| | ) | |
| Defendants. | | |

## VERDICT and OPINION

RICHARD MILLS, U.S. District Judge:

On March 7, 2012, Vernon Klinefelter and Geraldine Klinefelter were charged by Indictment with one count of wire fraud, one count of making a false statement to the Social Security Administration concerning an application for social security disability benefits, and one count of failing to disclose the occurrence of an event affecting an initial and continuing right to disability benefits. Both Defendants pleaded not guilty to the charges.

Pursuant to Rule 23(a) of the Federal Rules of Criminal Procedure, the Defendants waived their right to a jury trial and the Government

consented to a bench trial. The Court approved the Defendants' waiver and the Government's consent. Both Defendants also waived their right to an individual trial and consented to be tried jointly. The bench trial commenced on April 7, 2014 and concluded on April 17, 2014.

Pursuant to Rule 23(c), the Court makes the following findings of fact.[1]

The evidence showed that Defendant Vernon Ray Klinefelter was a licensed physician and surgeon in the State of Illinois. He married Defendant Geraldine Klinefelter in 1971. Geraldine Klinefelter was a registered nurse and an advanced practice nurse (nurse practitioner). The Defendants together operated Abundant Life Medical Clinic (Abundant Life) in Taylorville, Illinois. Dr. Klinefelter was also the resident/medical advisor of the Christian County Department of Public Health and was on staff as an independent contractor at St. Vincent Memorial Hospital in Taylorville, which is now known as Taylorville Memorial Hospital.

---

[1]Because the transcript has not yet been prepared, the Court relies on its memory of the testimony and notes in addition to the Stipulations and Exhibits, all of which have been reviewed.

# I.

## (A)

The first witness was Karen Randazzo.  The Court found Ms. Randazzo to be credible.  Ms. Randazzo, who has been an SSA Claims Representative since 2001, spoke to Geraldine Klinefelter on the telephone on March 31, 2004 regarding Vernon Klinefelter's application for disability benefits.  According to Government's Exhibit 1D, as testified to by Ms. Randazzo, the interview was conducted with Mrs. Klinefelter due to Dr. Klinefelter's confusion and inability to remember dates.  Ms Randazzo testified that her job during the interview is to record the information given to her by the applicant or applicant's representative.

The second witness was Patricia Wisniewski, a career SSA employee who was a technical expert at the time the Klinefelters were alleged to be defrauding the SSA.  Although she testified that a technical expert is similar to a claims representative, a technical expert would often perform quality control with more complex cases or assist other employees with such cases. The Court found Ms. Wisniewski to be a credible witness.

An individual could work and still receive social security disability benefits. Ms. Randazzo testified regarding the amount of "countable earnings" an employee could average on a monthly basis which showed that an individual was engaged in substantial gainful activity ("SGA") and thus ineligible for disability benefits. The per-month amounts are reflected in Government's Exhibit 1X as follows: (1) $780 in 2002; (2) $800 in 2003; (3) $810 in 2004; (4) $830 in 2005; (5) $860 in 2006; (6) $900 in 2007; and (7) $940 in 2008. Therefore, an employee who earned on average more than $800 per month in 2003 would be ineligible for social security disability benefits without regard to his or her medical condition. Similarly, an employee who earned in excess of $10,800 in 2007 would not be entitled to disability benefits even if he or she had a serious medical condition. Ms. Randazzo testified that an individual was either totally disabled or was not–because there is no such thing as partial disability for purposes of SSA disability benefits. If an individual earned the amount reflected in Exhibit 1X, then he or she was engaged in SGA without regard to the person's medical condition.

Ms. Wisniewski testified that based on her review of the documentation, Dr. Klinefelter's involvement was more than a few hours per week. He saw patients on a regular basis and provided significant services to Abundant Life. Dr. Klinefelter's income was significantly higher than the threshold amount for SGA under the SSA guidelines from 2002-2005.

Ms. Randazzo testified that social security disability benefits originated in Baltimore, Maryland, and the SSA encouraged eligible individuals to receive benefits via direct deposit.

Dr. Klinefelter first applied for disability benefits in 2000. This application resulted in a J1 Denial which, according to Ms. Randazzo, meant that the applicant was capable of engaging in SGA doing some other type of work than his relevant past work.

The application filed on behalf of Dr. Klinefelter alleged a disability onset date of December 31, 2002. According to Government's Exhibit 1B[2]

---

[2]Ms. Randazzo testified that each page of this exhibit is a reflection of a computer screen which was generated during Mrs. Klinefelter's telephonic application on March 31, 2004.

and Ms. Randazzo's testimony, Mrs. Klinefelter informed Ms. Randazzo that Dr. Klinefelter had not been actively involved in the family corporation since that date, when he turned all of his duties over to his wife who was a nurse practitioner. During that conversation, Mrs. Klinefelter also stated that Dr. Klinefelter could not perform simple mathematics and was no longer able to make rational decisions. Ms. Randazzo testified Mrs. Klinefelter told her that Dr. Klinefelter no longer saw patients, made no decisions and earned no income from the business. Ms. Wisniewski also testified that based upon her review of the file, it was reported that Dr. Klinefelter no longer saw patients. Those duties had been turned over to his spouse. Therefore, it was claimed that any earnings belonged to Mrs. Klinefelter.

Government's Exhibit 1AA is a summary of the Defendants' earnings at Abundant Life from 2001-2006.

Government's Exhibit 1C is the printed "Application for Disability Insurance Benefits" and appears to be consistent with the March 31, 2004 conversation between Ms. Randazzo and Mrs. Klinefelter, as testified to by

Ms. Randazzo. The exhibit further provides that Dr. Klinefelter has a continuing obligation to notify SSA if his medical condition improves and he is able to return to work. Dr. Klinefelter stated that his summary earnings appears to be correct except for 2002. He said that the earnings belong to his spouse. Moreover, he reported having a number of disabilities that have progressively gotten worse. These include seizures, severe memory problems and the inability to resolve simple mathematics. He further reported having a number of problems due to the medications he was taking at the time. Dr. Klinefelter affirmed that the information was true and signed the application on April 4, 2004. It was also signed by Mrs. Klinefelter as a witness.

Government's Exhibit 1E is a Form SSA-3368, which is titled "Disability Report" and is dated May 14, 2004. Dr. Klinefelter stated that he did not supervise other individuals while working as a medical doctor from 1984 to December 31, 2002. At the time, Dr. Klinefelter was examining other patients who had filed for disability benefits.

Government's Exhibit 1G is a second "Application for Disability

Insurance Benefits" that was sent to Dr. Klinefelter.  It is dated April 26, 2004 and appears to be identical in all respects to the April 4, 2004, Application, except it is signed only by Dr. Klinefelter on April 28, 2004.

Government's Exhibit 1H is an Activities of Daily Living Questionnaire which was submitted by Mrs. Klinefelter on behalf of Dr. Klinefelter and received by SSA on June 9, 2004.  Dr. Klinefelter stated that he leaves home at least twice a week when his wife makes him go to the office.  Government's Exhibit 1I is a Function Report prepared by Mrs. Klinefelter and dated June 1, 2004.  She states in part, "Ray has almost become a recluse."

Government's Exhibit 1M is an SSA Request for Corrective Action dated November 22, 2004.  Although Dr. Klinefelter had claimed an onset date of December 31, 2002, the information provided to SSA in June 2004 was that he tries to see two or three patients two afternoons per week.  Therefore, additional information was sought.

Ms. Randazzo testified regarding a Report of Contact dated January 21, 2005, which is Government's Exhibit 1P.  The report states that after

not working at all from February 2003 to June 2003, Dr. Klinefelter started working one to two afternoons per week, seeing 1 to 3 patients. Mrs. Klinefelter oversaw all patients and made all management decisions. The report notes that benefits were denied for the alleged onset date of April 9, 1999. However, Dr. Klinefelter's earnings continued to decline and a determination was made that he had not engaged in SGA since December 31, 2002.

Government's Exhibit 1R is a Notice of Award dated February 11, 2005, advising Dr. Klinefelter that he is entitled to monthly disability benefits retroactive to June 2003. Although SSA had determined that Dr. Klinefelter became disabled on December 31, 2002, there was a requirement of five consecutive months of disability before a claimant became entitled to benefits. Dr. Klinefelter was advised he would soon receive $34,504.00 for the previous months in which he was determined to be disabled and $1,778.00 on a monthly basis thereafter. Pursuant to Government's Exhibit 1T, the Defendants' child was informed he would

receive a retroactive sum of $11,143.00 due to Dr. Klinefelter's disability.[3]

Ms. Randazzo identified Government's Exhibit 1Y as an SSA record of monthly disability benefits to Dr. Klinefelter ranging from February 2005 through January 2008. It also includes the payment to the Klinefelters' son which is dated March 15, 2005. Ms. Randazzo testified that, according to the exhibit, the payments to Dr. Klinefelter continued until January 2008.

Ms. Randazzo testified that when the Defendants submitted forms stating that Dr. Klinefelter was not engaged in SGA, the SSA was not told that Mrs. Klinefelter was required to collaborate with a practicing physician. That information would be relevant to SSA if the business could not operate without a collaborating physician and Dr. Klinefelter was the only physician at Abundant Life at that time. It would be important in determining whether Dr. Klinefelter was engaged in SGA. Ms. Randazzo also testified that SSA was not told that Dr. Klinefelter was on staff at a hospital and had applied for re-credentialing during the time he was alleged

---

[3]The Defendants' child was no longer entitled to disability benefits after reaching adulthood.

to be disabled. This might also be significant in the SGA analysis. It would have been important for SSA to know if Dr. Klinefelter's condition could be controlled by medication. If SSA knew that Dr. Klinefelter was making more than the amounts listed in Government's Exhibit 1X during any of the months he received benefits, it would have determined that he was engaged in SGA and thus ineligible for benefits. If Ms. Randazzo had knowledge of Dr. Klinefelter's actual earnings in March of 2004 when speaking to Mrs. Klinefelter, she would have known that Dr. Klinefelter was ineligible for disability benefits.

Much of this information was corroborated by Ms. Wisniewski. Ms. Wisniewski also testified it would have been important information for SSA had it learned that during the time he was receiving disability benefits, Dr. Klinefelter was the medical doctor who examined a number of applicants who had applied for social security disability benefits.

(B)

According to Stipulation 1, Kelly Hartung is a witness who could testify regarding the Medicare enrollment forms and the systems and

procedures used to enroll Illinois providers in the Medicare program. Government's Exhibit 9A is a "Medicare/Federal Health Care Provider/Supplier Enrollment Application," which was submitted in or about November 2001 in the name of Abundant Life. Dr. Klinefelter is listed as the provider for the clinic and the manager of the corporation. The application is signed by a person purporting to be Dr. Klinefelter on or about August 20, 2001. Dr. Klinefelter is also listed as the "MD/Owner" of the business on Government's Exhibit 9B, which is a supplemental Medicare Enrollment Application submitted on or about November 13, 2001. On or about November 30, 2001, as shown in Government's Exhibit I0C, a "provider number" was issued to Abundant Life which was to be listed on every claim for services provided by Abundant Life. The Stipulation further provides that in 2008, Gerry Klinefelter applied for and received a separate Medicare provider number showing her as the provider responsible for Abundant Life.

Diana Betrany of Cahaba Safeguard Administrators testified at trial. Cahaba investigates fraud and abuse in medical billing. Government's

Exhibit 9E is an Overall Billing Summary Report for Abundant Life from March 22, 2002 through April 30, 2007. During that time, Dr. Klinefelter billed $207,187.80, of which $145,283.01 was allowed and $111,580.90 was paid. Government's Exhibit 9H is an Overall Billing Summary Report for Gerry Klinefelter for services from November 1, 2001 through July 31, 2008. During that time, the total sum billed was $451,615.60, of which $302,949.77 was allowed and $41,069.97 was deducted. The total sum paid was $210,580.46.

Unum, a private disability insurer, issued a policy to Dr. Klinefelter in 1995. Joe Griffin, a disability claims manager, testified that Unum provided policies to those who were totally or partially unable to work. Disability benefits could be awarded for total or partial disability. Mr. Griffin testified that Dr. Klinefelter could work to a certain extent while still obtaining benefits. Unum required that information be provided monthly in order to continue obtaining benefits. According to an Unum Clinical Review Request dated March 3, 2004, which was admitted as Government's Exhibit 6JJJ, Mrs. Klinefelter reported that Dr. Klinefelter

was out of work for most of 2003.  At that time, she stated he was working three hours per week seeing patients only in her presence.  This is inconsistent with the statement Mrs. Klinefelter would make to Ms. Randazzo four weeks later.  Mrs. Klinefelter told Unum she was generating 90% of the income of the practice.

Patricia Wisniewski testified that if there was no partnership agreement between Dr. Klinefelter and Mrs. Klinefelter, the profits from Abundant Life should have been divided evenly.  If divided evenly, then Abundant Life's profit and loss statements from January 2003 through August 2005 establish that Dr. Klinefelter was engaged in significant services and SGA at those times.  Government's Exhibit 6PPP is a letter dated December 11, 2003 from Mrs. Klinefelter to Unum.  The letter pertains to Dr. Klinefelter's "draw" for tax purposes.  The letter states in part: "We did not feel that it mattered whose name was on the "draw" taken as our income since we had been married for thirty-two years and we considered the income as 'ours.'"

Donna Podeschi, a registered nurse in charge of quality assurance at

Taylorville Memorial Hospital, testified regarding her knowledge of the Klinefelters at the time Dr. Klinefelter was applying for disability benefits. Ms. Podeschi was competent to testify regarding credentialing and hospital privileges at the time in question. Government's Exhibit 7C is an Addendum to the State's "Health Care Professional Recredentialing and Business Data Gathering Form" for Vernon Ray Klinefelter, M.D. The form was purportedly signed by Dr. Klinefelter on April 5, 2005. The form provides that Dr. Klinefelter is the collaborating physician for Gerry A. Klinefelter RN, FNP. Dr. Klinefelter stated that he was actively a member of the medical staff and had been since July of 1993.

On the form, Dr. Klinefelter lists Abundant Life as the primary site where he practices and states that "2400+" active patients are enrolled. Moreover, he stated approximately 5,000 patients visited the site each year. In the section on his own medical condition, Dr. Klinefelter stated that he had a seizure disorder, chronic back pain and peripheral neuropathy, a problem with his right arm resulting from the fracture of his humerus and hypopituitarism. Dr. Klinefelter claimed none of the conditions would

affect his ability to practice or perform a full range of clinical activities because the conditions were controlled with medication.

Ms. Podeschi claimed she was not aware of any concerns with Dr. Klinefelter between 2003 and 2005. She did not recall any issues regarding Dr. Klinefelter that had to be reported to the Hospital Board. Ms. Podeschi reviewed Government's Exhibits 7G and 7G-1, which provided that Dr. Klinefelter was present at a number of staff meetings ranging from January of 2003 to December of 2006, though these records show he did not attend most of the staff meetings during that period of time.

Daniel Raab, the President and CEO of Taylorville Memorial Hospital, testified that he had a positive and professional relationship with the Klinefelters. Mr. Raab attended most medical staff meetings and committee meetings. Between 2003 and 2007, Mr. Raab regularly interacted with Dr. Klinefelter and did not observe anything that caused him to be concerned about Dr. Klinefelter's condition. Moreover, no member of the hospital staff ever expressed any concern about Dr. Klinefelter to Mr. Raab.

Mr. Raab also testified that Dr. Klinefelter had admission privileges at the hospital during the time the crimes were alleged to occur. In smaller communities like Taylorville, all–or virtually all–area physicians have hospital privileges. The number of patients admitted by Dr. Klinefelter was extremely low when compared to other physicians. Mr. Raab testified that it is a somewhat rigorous credentialing process to obtain admission privileges. Dr. Klinefelter has not had admission privileges at Taylorville Memorial Hospital since 2008.

Ismie Mutual Insurance Company is a professional liability insurer for physicians. Robert Caine, an assistant legal counsel at Ismie, testified regarding Dr. Klinefelter's policy and the records associated with it. Although in September of 2001 Dr. Klinefelter disclosed his medical issues which affected his ability to practice, in November of 2005, in answer to the inquiry whether he had incurred or become aware of "having any illness or physical disability that impairs or potentially could impair your ability to practice medicine," Dr. Klinefelter marked "No."

Gerry Grigsby, a registered nurse and the former administrator of the

Christian County Health Department, testified regarding Dr. Klinefelter's participation on the Christian County Health Board. The department is a local agency that provides programs and services. The board generally consisted of eight members who did not receive compensation. Ms. Grisby testified that the board typically met quarterly and the meetings generally lasted about one hour. The Minutes of the Christian County Health Board meetings ranging from January of 2003 to September of 2007 were admitted as exhibits. Government Exhibit 5E is a copy of the Minutes of the March 25, 2004 meeting, when Dr. Klinefelter was re-elected as President for the 2004 fiscal year. This was within one week of Mrs. Klinefelter's conversation with Ms. Randazzo about Dr. Klinefelter's application for SSA disability benefits.

Ms. Grigsby testified that Dr. Klinefelter was an active participant at the meetings and she could not recall him missing any meetings. She had no problems communicating with Dr. Klinefelter. Ms. Grigsby stated that if she left a telephone message for Dr. Klinefelter about a matter that required his attention, he would usually return her call by the next day.

(C)

According to Amended Stipulation 2, Marsha Eiter is a witness who is competent to testify as to the process that takes place when a claim is submitted by a medical provider performing services for a Medicaid recipient. Government's Exhibit 10F is a Provider Enrollment Application for Dr. Klinefelter and related documents dated on or about September 21, 2001, and an Agreement for Participation for Dr. Klinefelter dated October 29, 2001. Government's Exhibit 10G is an undated Provider Enrollment Application for Gerry A. Klinefelter, RN, FNP and related documents including an "Advanced Practice Nurse Collaborative Agreement" dated September 1, 2001. Dr. Klinefelter is listed as Mrs. Klinefelter's "Collaborating Physician" and the agreement is signed by both Defendants. This exhibit also includes correspondence from Abundant Life dated July 31, 2008, naming Dr. Randolph Martin as a new Collaborating Physician. Another Stipulation provides that effective on or about August 2008, Dr. Martin became the collaborating physician for Abundant Life for a sum of $500.00 per month.

Amended Stipulation 2 also provides that Government's Exhibit 10A is a disk containing data from Medicaid claims submitted and processed by the Illinois Department of Healthcare and Family Services, from Dr. and Mrs. Klinefelter. Based on a review of the data, according to a summary report created from the claims data for Dr. Klinefelter which was admitted as Government's Exhibit 10B, between December 1, 2002 and December 31, 2007, there were 105 claims submitted detailing 106 services to 61 different Medicaid recipients. The stipulation further states that Government's Exhibit 10D is a "provider detail claim" summary report created from the data in Government's Exhibit 10A regarding claims submitted under Mrs. Klinefelter's provider identification number. Based on this review, between December 1, 2002 and December 31, 2007, 1,626 claims were submitted detailing 1,639 services provided to 256 different Medicaid recipients.

According to Stipulation 3, Elizabeth Overstreet is competent to testify regarding the process that takes place when a claim is submitted by a medical provider performing services for a person insured by Blue Cross

and Blue Shield of Illinois (Blue Cross and Blue Shield). She is also familiar with the types of records maintained by Blue Cross and Blue Shield. Claims are typically submitted by a "provider" of medical service for payment under a contract of insurance the patient may have with the insurance company. A physician might have a higher rate of reimbursement than a physician's assistant, nurse practitioner or other qualified provider of medical care.

Stipulation 3 provides that Government's Exhibit 11A is a Provider Agreement and a "PPO Addendum" dated on or about October 26, 2001 between Blue Cross and Blue Shield and Abundant Life. Vernon Ray Klinefelter, M.D., of Taylorville, Illinois, is listed as the participating provider who was responsible under the contract for services rendered. Dr. Klinefelter's medical license number is listed on the agreement.

Stipulation 3 further states that Ms. Overstreet would testify that Government's Exhibit 11C is a "ProviderID Summary" for Abundant Life from January 1, 2002 through December 31, 2010. Exhibit 11C accurately summarizes the data collected from claims submitted during the time

period and determined that Abundant Life submitted a total of 8,390 claims for 9,745 units of service, for 1,089 different patients. Abundant Life requested payment in the amount of $654,866.90 for those services. Of that amount, it was determined that $558,227.68 was "allowed" and $332,985.28 was paid. Ms. Overstreet would testify that the difference between the "allowed" and "paid" amounts are due to beneficiary co-payments and deductibles, in addition to other possible factors. Abundant Life could collect the difference from its patients.

Stipulation 3 also provides that Government's Exhibit 1D is a "DOS Summary" or "Date of Service" summary, which is broken down by month and year for the entire period, showing the number of unique patients covered by Blue Cross and Blue Shield for which Abundant Life submitted claims for payment, the number of claims submitted for each month, the total amount billed for the services, the total amount "allowed" by Blue Cross and Blue Shield, and the total amount paid to Abundant Life for the services. Ms. Overstreet would testify that in April of 2004, for example, the summary shows that Abundant Life submitted 122 claims listing 128

services provided to 96 different patients. It billed $8,901.80 for these services, of which $8,091.11 was allowed. Blue Cross and Blue Shield then paid $4,061.05 for the services on behalf of its insureds. The summary further shows that in May 2004, Abundant Life submitted 104 claims listing 110 services provided to 89 different patients. Abundant Life billed $7,436.60 for the services, and $6,803.30 was allowed. Blue Cross and Blue Shield of Illinois then paid $3,850.06 for the services on behalf of its insureds.

Patrick Holtgrave, a Special Agent with the Department of Health and Human Services who investigates allegations of fraud against health care providers, was brought in by the Government's case agent to assist in the investigation. Special Agent Holtgrave testified regarding the annual amounts billed by the Klinefelters to Medicaid, Medicare and Blue Cross/Blue Shield from 2003 through 2007 (through June 29, 2007), as provided in Government's Exhibit 13D–a summary exhibit based on claims data and used for demonstrative purposes. The Medicaid and Medicare amounts are broken down as to each Defendant, while the Blue Cross/Blue

Shield amounts do not distinguish between Dr. Klinefelter and Mrs. Klinefelter.

The total amount billed in 2003 was $241,332.53, of which $117,537.21 was paid. In 2004, the total amount billed was $213,598.17, of which $110,225.64 was paid. The total amount billed in 2005 was $230,121.02, and $107,788.16 was paid. In 2006, $202,550.93 was billed, of which $101,963.13 was paid. Through June 29, 2007, the Klinefelters billed $111,290.19, and $48,190.24 was paid.

(D)

Special Agent Rodney Haymon, the Government's case agent, was the final witness for the Government. Agent Haymon testified he has worked at SSA since 2003 and investigates allegations of waste, fraud and abuse in connection with benefits. He corroborated much of the earlier testimony and discussed the origins of the investigation. Haymon further testified that the investigation of the Klinefelters began in April of 2007 in order to determine if the SSA disability benefits were properly paid to Dr. Klinefelter.

Agent Haymon identified Government's Exhibit 3D, a copy of Medical Evidence Requests for Selected Vendors from January 1, 2002 through December 31, 2008. This is an Illinois Disability Determination Services form. It is a record of individuals who applied for disability benefits and listed Abundant Life or one of the Klinefelters as their provider, or vendor. The document lists the vendor name, the claimant's social security number, the request date and the date the information was received. There were 28 claims wherein Abundant Life is listed as the provider, 23 for Dr. Klinefelter and 45 for Mrs. Klinefelter. This results in a total of 96 claims.

Agent Haymon identified Government's Exhibits 2A-2E, which are detailed medical records maintained by SSA. Exhibit 2A is an SSA Disability Report Form 3368 of an individual who is also listed on Exhibit 3D as having submitted a claim from Abundant Life. The patient reported first visiting Abundant Life in February of 2002 and last visiting in June of 2004. She regularly saw Dr. Klinefelter. The Form 3368 provides that Dr. Klinefelter examined the patient on March 25, 2004 and May 25, 2004.

Government's Exhibit 2B is an SSA Disability Report Appeal Form 3441 of an individual who is also listed on Exhibit 3D as having received services and submitted a claim from Abundant Life. The patient reported seeing Dr. Klinefelter at Abundant Life. His first visit to Abundant Life was July 30, 2003, and the last visit was on April 12, 2004. The Form 3441 shows Dr. Klinefelter examined the patient on March 11, 2004, less than three weeks before Mrs. Klinefelter's telephone conversation with Ms. Randazzo, and on April 13, 2004, two weeks after that conversation.

Government's Exhibit 2C is another Disability Report Form 3368 from an individual who is also listed on Exhibit 3D as having received services and submitted a claim from Dr. Klinefelter. The patient reported first seeing Dr. Klinefelter in October of 2002 and last visiting him in September of 2004. The Form 3368 provides that Dr. Klinefelter examined the patient on January 14, 2003, which was two weeks after his alleged onset date. The patient was examined by Mrs. Klinefelter during the next few appointments throughout 2003. Dr. Klinefelter examined the patient on January 8, 2004, May 11, 2004, June 24, 2004 and September 30,

2004.  Mrs. Klinefelter examined him on April 26, 2004 and on August 27, 2004.

Government's Exhibit 2D in a Disability Report Form 3368 from an individual who is also listed on Exhibit 3D as having received services and submitting claims from Abundant Life.  Dr. Klinefelter examined the patient on July 13, 2004.  Mrs. Klinefelter examined him in October of 2004.

Government's Exhibit 2E includes Disability Report Forms 3368 from a number of individuals who are also listed on Exhibit 3D as having received services and submitted a claim from Abundant Life, Dr. Klinefelter or Mrs. Klinefelter.  Exhibits 2A-2E are several examples of the 96 Medical Evidence Requests listed in Exhibit 3D.

Government's Exhibit 13E is a timeline of key events in the case from Dr. Klinefelter's first application for social security disability benefits in September of 2000 to September of 2007.  It is a summary exhibit prepared by Special Agent Haymon.  The exhibit provides the record source of the statement or event.

Special Agent Haymon testified the exhibit shows that the first application resulted in a J1 denial in March of 2001. By then, Dr. Klinefelter was receiving disability benefits from Unum. In September of 2002, Mrs. Klinefelter submitted her recredentialing form to St. Vincent Hospital which stated that Dr. Klinefelter is her "supervising M.D." The document was signed by Dr. Klinefelter and provided that, as Mrs. Klinefelter's sponsor, he was responsible for all of her professional acts.

Agent Haymon testified that Exhibit 13E notes SSA was told Dr. Klinefelter was disabled and unable to work as of December 31, 2002. He attended a medical staff meeting and county health department meetings in January of 2003 and attended other meetings later that year. Dr. Klinefelter was the treating physician for a patient at St. Vincent Hospital in February, July and September of 2003. In August and October of 2003, Dr. Klinefelter was the treating physician for two patients at the hospital. In November of 2003, Dr. Klinefelter treated four patients at the hospital. On July 22, 2003, on the St. Vincent's recredentialing form, Dr. Klinefelter noted having three medical conditions but described the status of these

medical impairments as "Good," stated he was accepting new patients and that he did not have any medical impairment or condition that impaired or limited his ability to practice.

Agent Haymon testified that Exhibit 13E shows that on January 8, March 11 and 25, 2004, Dr. Klinefelter examined individuals who had applied for social security disability benefits at Abundant Life. Between March 19 and March 25, 2004, Dr. Klinefelter was the treating physician at St. Vincent Hospital for three different patients. On March 25, 2004, it was also determined that Dr. Klinefelter would remain on the Christian County Board of Health Department as President for the 2004 fiscal year. The exhibit shows that according to Unum records, Dr. Klinefelter was seen on March 12, 2004 for a follow-up appointment for severe right shoulder and back pain. Philip Dy, MD, noted that Dr. Klinefelter reported that "pain control has been so much better, and he rates it now a 2 out of 10." Mrs. Klinefelter's telephone application for social security disability benefits on behalf of Dr. Klinefelter was March 31, 2004, at which time a number of statements were made which are inconsistent with the evidence. During

the conversation, Mrs. Klinefelter stated that Dr. Klinefelter did not supervise people and said more than once that Dr. Klinefelter has not worked since December 31, 2002. Dr. Klinefelter represented he had not been involved with the family corporation since that date.

Agent Haymon testified that the exhibit shows Dr. Klinefelter examined or treated three different patients, including one applicant for social security disability benefits, on April 13, 21-22 and 26-27, 2004. On April 26, 2004, Dr. Klinefelter signed a new application alleging he was disabled and unable to work as of December 31, 2002, and further agreeing that his onset date could change if earnings are posted to his record.

Agent Haymon testified that the exhibit shows Dr. Klinefelter examined at least three different patients in May of 2004, including two social security disability applicants. Also in May of 2004, Dr. Klinefelter examined another patient at a skilled nursing facility and billed Medicare. It was noted in an SSA Report that SSA had no contact with Dr. Klinefelter in connection with his application because of his confusion and inability to remember dates.

Agent Haymon testified Exhibit 13E shows that according to an SSA Function Report Adult Third Party and letter dated June 1, 2004, Mrs. Klinefelter reported that Dr. Klinefelter had tried to work on an extremely limited basis and at the time saw two or three patients one or two afternoons a week. She stated he had almost become a recluse. On the same form, Dr. Klinefelter reported that his wife made him go to the office in the late afternoon. In June of 2004, Dr. Klinefelter provided services to three different patients over the course of several days at different locations. In July and August of 2004, Dr. Klinefelter examined separate patients who had applied for social security disability benefits. In August and September of 2004, he examined a patient at a skilled nursing home and billed Medicare on three separate dates. On September 15, 2004, Mrs. Klinefelter represented in a letter to Unum that Dr. Klinefelter's income for 2002 was $46,708, representing 8.7% of the clinic's gross charges of $538,135. Later in September of 2004, Dr. Klinefelter examined two more patients, including another applicant for social security disability.

Government's Exhibit 13E shows that Dr. Klinefelter continued

seeing patients on a limited basis and attending meetings during the final three months of 2004.  In an October 19, 2004 interview with Unum, Dr. Klinefelter stated that because of his pain medications and anti-seizure medicine, he was able to see enough patients per week to keep his name on the door of the practice and therefore keep it open.  Dr. Klinefelter further stated that he knew he should not be treating patients and was a potential liability.  He and his wife kept his medical condition a secret from others in the medical community.  Dr. Klinefelter said he attended meetings and committees as necessary to maintain his hospital privileges.

Exhibit 13E provides that on November 19, 2004, an SSA case analysis performed by a physician determined that Dr. Klinefelter's complex partial seizures had "not been well controlled with combination of medications."  On November 29, 2004, in a supplemental statement to Unum, Dr. Klinefelter advised that on most Tuesday and Thursday afternoons, he tried to "see one to three carefully chosen patients" that were not very difficult.  He further said he was trying part-time work and that his doctors advised against full-time work.

Agent Haymon testified that the exhibit shows that according to an SSA Work Activity Report on December 27, 2004, Dr. Klinefelter stated he worked "one or two afternoons per week when able seeing one to three carefully selected patients." He stated that he made no management decisions after the illness and that any management decisions related to the clinic were made by Mrs. Klinefelter. Agent Haymon testified this form was requested following the June 1, 2004 report about Dr. Klinefelter performing a limited amount of work and which appeared inconsistent with previous statements about the extent of his work activities. Agent Haymon further testified Mrs. Klinefelter's contemporaneous letter provided that Dr. Klinefelter would make approximately $7,000 in 2004.

Exhibit 13E provides that, according to Mrs. Klinefelter's professional and recredentialing form for the St. Vincent Hospital, her "patients are admitted under Dr. Klinefelter." Her insurance was through Dr. Klinefelter. Moreover, Dr. Klinefelter had signed on October 14, 2004, that "he assumed ultimate responsibility for all the professional acts of GK."

Agent Haymon testified the exhibit showed that Dr. Klinefelter continued treating patients and attending occasional meetings throughout 2005. In a July 2005 supplemental statement to Unum, Dr. Klinefelter reported that he tried to see two to three patients that are not challenging on Tuesday and Thursday afternoons. He stated he did not receive a regular paycheck, but was compensated by being able to continue feeling like a doctor. According to a November 2, 2005 supplemental statement to Unum, Dr. Klinefelter reported working occasional Tuesday and Thursday afternoons "when I'm up to it" and seeing one to three patients. Agent Haymon testified the exhibit indicates that on November 22, 2005, Dr. Klinefelter reported to his liability insurer that there was no illness or physical disability impairing or that could potentially impair his ability to practice medicine.

Agent Haymon testified Exhibit 13E shows that Dr. Klinefelter continued treating patients and attending meetings throughout 2006. In a November 15, 2006 supplemental statement, Dr. Klinefelter reported to Unum that he works on occasional Tuesday and Thursday afternoons

"when someone asks to see me for those things I can still do, and I am up to it." He stated: "My only real compensation is malpractice ins. and medical ins." The exhibit provides that on December 5, 2006, Mrs. Klinefelter told an Unum representative that Dr. Klinefelter still worked two days per week so that she could continue as nurse practitioner and make it appear that Dr. Klinefelter was still practicing. Dr. Klinefelter's December 26, 2006 and January 7, 2007, Unum supplemental statements are consistent with the ones from the previous month. On February 19, 2007, Dr. Klinefelter stated he was doing some part-time work, though he had never regained full brain function since having a seizure. He reported working less due to the cold weather.

Exhibit 13E provides that on April 18, 2007, the Klinefelters had an interview with Unum. Dr. Klinefelter said his duties and amount of work were essentially unchanged from the previous visit. Mrs. Klinefelter stated she checked Dr. Klinefelter's work for accuracy. She further said that they knew Dr. Klinefelter should not be practicing but they were abiding by the laws and wanted to keep the practice viable until a replacement could be

found.  Dr. Klinefelter stated that because of the medication he was taking, he was able to see enough patients per week to keep his name on the door and maintain the practice.  He further told the Unum representative that he had no "specific doctor imposed restrictions or limitations."  However, Dr. Klinefelter stated he knew he should not be treating patients and that he is a potential liability.  Moreover, he and his wife had kept his medical problems a closely guarded secret.

Dr. Klinefelter attended county medical board meetings in March, June and September of 2007.

On June 19, 2007, Agent Haymon spoke to the Klinefelters at their home.  He was accompanied by another agent.  Both Defendants agreed to speak to him.   Agent Haymon described the meeting as a pleasant conversation.  Mrs. Klinefelter was not present at the home for the entire interview.  After a few minutes, she left to go to Abundant Life while Dr. Klinefelter continued to talk to Haymon.  According to Agent Haymon, the interview with Dr. Klinefelter lasted approximately 40-45 minutes.

Dr. Klinefelter informed Agent Haymon that although he previously

owned Abundant Life, his wife now owned the medical facility. Agent Haymon testified Dr. Klinefelter informed him no other physicians were associated with Abundant Life at that time and he supervised his nurse practitioner wife. Dr. Klinefelter told Haymon that he saw patients two days per week. He read charts, made diagnoses, wrote prescriptions and determined treatment. Agent Haymon testified Dr. Klinefelter said that while he was not required to be present at the clinic, he needed to be available to supervise Mrs. Klinefelter. As her supervising physician, Dr. Klinefelter reviewed ten or more of her cases every two weeks and was accessible by telephone. Dr. Klinefelter informed Haymon that he admitted patients to the hospital, ordered tests and signed off on Mrs. Klinefelter's work. He said he was not totally disabled and had been advised by doctors that he could work. Dr. Klinefelter was shown a copy of the April 26, 2004 Application for Disability Insurance Benefits. Agent Haymon testified Dr. Klinefelter told him that although he did not recall writing on the form, he affirmed it included his signature.

While interviewing Dr. Klinefelter, Agent Haymon observed medical

records and charts as if Dr. Klinefelter had been working at home. He noticed Dr. Klinefelter's signature on certain forms, including what appeared to be a prescription pad. Haymon testified Dr. Klinefelter did not give any indication that he should not be seeing patients.

Following the interview with Dr. Klinefelter, Agent Haymon visited Abundant Life to talk to Mrs. Klinefelter. Government's Exhibit 3A is the Advanced Practice Nursing Collaborative Agreement, which provides that the collaborating physician for Advanced Practice Nurse Gerry A. Klinefelter is Vernon Ray Klinefelter, M.D. Mrs. Klinefelter informed Agent Haymon that was her only collaborative agreement. Moreover, Dr. Klinefelter collaborates with her, reviews medical charts and insures she follows the proper guidelines. Although Mrs. Klinefelter is permitted to prescribe medication, she is not authorized to prescribe any schedule II narcotics.

While at Abundant Life, Agent Haymon reviewed certain records. Government's Exhibit 3B is a calendar of Dr. Klinefelter's appointments from January of 2007 to June 16, 2007. Dr. Klinefelter saw a total of 77

patients during that period, which is an average of approximately 13 patients per month. Agent Haymon obtained a business card, which is Government's Exhibit 3C, identifying the medical providers at Abundant Life as Ray Klinefelter, M.D., and Gerry Klinefelter, MSN, RN, FNP.

According to a Supplemental Statement to Unum, as reflected in Government's Exhibit 6BBB and which is dated June 27, 2007, on June 5, 2007, Dr. Klinefelter saw three patients over two hours. On June 12, 2007, he saw two patients over one and one-half hours. On June 14, 2007, Dr. Klinefelter saw two patients over two hours and on June 21, 2007, he saw two patients over one and one-half hours. Dr. Klinefelter also reported making the rounds with Mrs. Klinefelter on two nursing home patients and two hospital patients. In a Supplemental Statement to Unum, which was admitted as Government's Exhibit 6AAA and is dated July 27, 2007, Dr. Klinefelter reported being able to go to the office only twice that month.

According to a "Report of Continuing Disability Interview," as reflected in Government's Exhibit 1U which is dated July 20, 2007, Dr. Klinefelter stated he was unable to return to work beyond the limited

amount he was then working on good days. Government's Exhibit 1V is an SSA Work Activity Report, which is signed by both Defendants on August 28, 2007. In response to whether the applicant made management decisions after the injury or illness, Dr. Klinefelter marked "No" and stated, "Wife manages the medical clinic."

In the narrative part of Exhibit 1V, in response to an inquiry about "present work activities," Mrs. Klinefelter responded, "Ray works one afternoon per week in the office" and "sees one to four patients per afternoon usually." Mr. Klinefelter also states, "Ray is also my 'supervising physician'" and "we share the same patients, he reviews six to eight charts of mine weekly as he is seeing the patients." This was the first time Dr. Klinefelter was identified by either Defendant on an SSA form as a "supervising physician." This statement was made more than two years after Dr. Klinefelter started receiving benefits and after the Klinefelters were aware of the criminal investigation. On December 27, 2004, Mrs. Klinefelter had described Dr. Klinefelter's activities as working "one or two afternoons per week when able, seeing one to three carefully selected

40

patients."

Agent Haymon testified that an individual receiving social security disability benefits has a continuing obligation to report any changes in his condition to SSA. Dr. Klinefelter never reported any change to the SSA after he was first awarded benefits in February of 2005. He did not report to SSA that he was the collaborating physician and supervisor at Abundant Life.

(E)

Pamela Williams, a certified nursing assistant, testified for the Defendants. She was a patient at Abundant Life in 2006 and was employed there on a part-time basis as a nursing technician from September of 2007 until February of 2013. Ms. Williams testified that she had not met Dr. Klinefelter when she began her employment and did not meet him until approximately three months after she started. She sometimes saw him late in the afternoon. She testified there was at least one occasion when Dr. Klinefelter did not appear at work when he was expected at Abundant Life. Moreover, there were instances in which he had to cancel appointments

because he was unable to function properly. Ms. Williams testified that Mrs. Klinefelter did the hiring and firing and Dr. Klinefelter exercised no management or supervisory duties.

Ms. Williams testified she did not believe that Mrs. Klinefelter acted beyond the scope of her license. Moreover, she acknowledged Mrs. Klinefelter could not prescribe a narcotic. Ms. Williams further testified that Dr. Klinefelter could have been reviewing files at home or at the office when she was not present.

Joanne Leonard is a practical nurse who began working at Abundant Life in January of 2005 on a part-time basis. She testified she is still employed at the clinic. From 2005 through 2007, Ms. Leonard averaged 25-30 hours per week at Abundant Life. She worked mostly with Mrs. Klinefelter and stated Dr. Klinefelter usually worked on Tuesday and Thursday afternoons when he would generally see two and no more than three patients. However, it was not uncommon for Dr. Klinefelter to be unable to work. Ms. Leonard testified that Dr. Klinefelter was unable to come in on two or three occasions per month. Ms. Leonard testified that

Mrs. Klinefelter hired and fired and disciplined employees, in addition to other administrative functions.

Ms. Leonard testified that she did not question Dr. Klinefelter's ability to practice. Moreover, she believed Dr. Klinefelter could review any charts and prescribe narcotics in order for Mrs. Klinefelter to operate within the scope of her license. Dr. Klinefelter was the only physician at Abundant Life until August of 2008.

Betty Farrell, a staff nurse at Abundant Life from November of 2002 until 2008, testified that she worked two to three days per week. She stated that Dr. Klinefelter worked two to three days per week and usually saw no more than two patients in the afternoon. Dr. Klinefelter's appointments sometimes had to be canceled or rescheduled because he was unable to come in or lacked the energy to see patients. Mrs. Klinefelter was the primary medical provider. Ms. Farrell also testified that Mrs. Klinefelter hired and fired employees, trained employees, and performed other administrative tasks.

Ms. Farrell testified that between 2002 and 2008, she believed Dr.

Klinefelter treated patients to the best of his ability. She never warned patients not to see him. Ms. Farrell could not recall if Dr. Klinefelter prescribed narcotics. Although she did not recall whether Dr. Klinefelter was Mrs. Klinefelter's collaborating physician in 2007, Mrs. Farrell testified that he was the only physician then at Abundant Life. Ms. Farrell did not know whether his condition was controlled with medication. She could not say whether patients Dr. Klinefelter saw in the hospital were at risk. Ms. Farrell also did not know if Dr. Klinefelter had a disease or condition that impaired his ability from 2004-2008. She did not know whether Dr. Klinefelter or Mrs. Klinefelter had hospital privileges. She believed both of them were truthful individuals.

Government's Exhibit 7E is a letter dated January 12, 2005 from Mr. Raab to Mrs. Klinefelter advising her of her reappointment to the medical staff at St. Vincent Memorial Hospital from January 2005-January 2007, which was effective upon her completion of the form and agreement to certain conditions. According to the form, Mrs. Klinefelter's patients were admitted under Dr. Klinefelter. Moreover, Dr. Klinefelter completed and

signed an evaluation dated October 26, 2004, wherein he represented himself as Mrs. Klinefelter's "supervisor."

Ms. Farrell testified that Dr. Klinefelter saw far fewer patients than other physicians with whom she had worked.

## II.

Count I accuses Vernon Klinefelter and Geraldine Klinefelter of wire fraud. It is alleged that, between March of 2004 and January of 2008, the Defendants knowingly devised or participated in a scheme to defraud the SSA and to obtain its money and property by means of false and fraudulent pretenses, representations, promises and material omissions. In order for the Court to find the Defendants guilty, the Government must prove (1) that Defendant knowingly devised or participated in a scheme to defraud as described in Count I; (2) that Defendant did so with the intent to defraud; (3) the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise; and (4) that for the purpose of carrying out the scheme or attempting to do so, the Defendant caused interstate wire communications to take place in the manner as alleged. See

Seventh Circuit Federal Jury Instructions, P. 214, 18 U.S.C. § 1343.

A scheme to defraud is a scheme that is intended to deceive or cheat another and to obtain money or property or cause the potential loss of money or property to another by means of materially false or fraudulent pretenses, representations or promises. See Seventh Circuit Federal Jury Instructions, P. 215, 18 U.S.C. § 1343. The Government need not prove that the scheme to defraud actually succeeded. See Seventh Circuit Federal Jury Instructions, P. 217, 18 U.S.C. § 1343

The Government proved beyond a reasonable doubt that Vernon Klinefelter and Geraldine Klinefelter knowingly devised or participated in a plan or course of action to defraud the SSA. The Defendants' false and/or fraudulent representations and omissions were designed to obtain the money or cause the potential loss of money to SSA. The evidence which establishes the guilt of Dr. Klinefelter and Mrs. Klinefelter consists mostly of information that Defendants either provided or failed to provide, in addition to their actions, over a nearly four-year period.

The evidence shows that on March 31, 2004, Mrs. Klinefelter made

a number of false and fraudulent representations and/or concealed material information in her conversation with Ms. Randazzo. She stated that he suffered from many disabilities and, due to a seizure disorder, Dr. Klinefelter had memory problems and could not resolve simple mathematics. There is no dispute that Dr. Klinefelter had a number of medical issues. However, the evidence showed that these conditions were significantly exaggerated by the Defendants. Mrs. Klinefelter's statement that Dr. Klinefelter had not been actively involved in the family corporation since December 31, 2002 is false. It was known to be false by both Defendants at the time it was made. Dr. Klinefelter was involved in the family corporation seeing patients that very month. Moreover after December 31, 2002, the Defendants billed large amounts of money to Medicare, Medicaid and Blue Cross/Blue Shield. As Counsel for the Government stated, Dr. Klinefelter and Mrs. Klinefelter were billing "serious money."

Mrs. Klinefelter's statement to Ms. Randazzo that Dr. Klinefelter no longer saw patients is false. On both March 11 and 25, 2004, Dr.

Klinefelter examined an individual who had applied for social security disability benefits. He had treated patients in the hospital on March 19-20 and 24-25, 2004. Dr. Klinefelter was voted President of the Christian County Health Board at a meeting held on March 25, 2004–less than one week before Mrs. Klinefelter's conversation with Ms. Randazzo. Dr. Klinefelter saw patients on March 29, 2004. At the time, Dr. Klinefelter was submitting claims to Medicare for work he had performed. Mrs. Klinefelter's statements during the telephone call that he made no decisions, did not supervise anyone and earned no income from the business were also false.

Dr. Klinefelter had applied for social security disability benefits several years earlier when he was making well over the SSA threshold amount. That application was denied. Dr. Klinefelter had also applied for and received private disability benefits based on his reduction in income. The Klinefelters were aware of how the different processes worked.

The evidence shows there were also false and fraudulent representations made by the Defendants on April 4, 2004. On that date,

Dr. Klinefelter signed the "Application for Disability Insurance Benefits" representing that the information on the form, which appears to be consistent with the March 31, 2004 conversation, was correct and affirming that he would notify SSA if his condition improved and he were able to return to work. Mrs. Klinefelter signed the document as a witness.

The evidence shows there was a false and fraudulent representation by Dr. Klinefelter on April 28, 2004, when he signed another "Application for Disability Insurance Benefits." The Government proved beyond a reasonable doubt that Defendants made false or fraudulent representations on March 31, 2004, April 4, 2004 and April 28, 2004.

On June 1, 2004, Mrs. Klinefelter described her husband as almost a "recluse." This was a fraudulent misrepresentation which was designed to obtain benefits. At the time, Dr. Klinefelter was an active practicing physician who treated patients, attended meetings and supervised Mrs. Klinefelter.

Additionally, the Court concludes beyond a reasonable doubt that on or about December 27, 2004, the Defendants falsely represented the extent

to which Dr. Klinefelter was able to work and whether he made any management decisions following his illness or injury. Although Dr. Klinefelter may not have seen as many patients as the average doctor, the evidence showed that he saw more than "one to three carefully selected patients" one to two afternoons per week. Between May and December of 2004, Dr. Klinefelter saw at least eleven different patients in the hospital. These patients were not "carefully selected." Some of the Defendants' own witnesses testified that Dr. Klinefelter was capable of treating patients and Mrs. Klinefelter was not acting outside the scope of her license. As Mrs. Klinefelter's supervisor and the only physician at Abundant Life, Dr. Klinefelter was responsible for her professional acts and made management decisions. Moreover, Abundant Life could not have stayed open without him. The Court concludes that the Government proved beyond a reasonable doubt that the foregoing statements were false or fraudulent representations.

The Government proved beyond a reasonable doubt that Defendants did not inform SSA of the full extent of Dr. Klinefelter's work activity,

including that he supervised Mrs. Klinefelter, was on staff as an independent contractor with and had hospital privileges at St. Vincent Memorial Hospital and he had on two occasions as part of the re-credentialing process, including in April of 2005, advised the hospital that his condition was controlled with medication and should not cause any problems in practicing medicine. Dr. Klinefelter was also reviewing medical charts at home.

According to Government's Exhibit 1C, a document signed by both Defendants on April 4, 2004, Dr. Klinefelter was no longer involved with Abundant Life. As reflected in Government's Exhibit 7E, Dr. Klinefelter affirmed on October 26, 2004 that he was Mrs. Klinefelter's supervisor at Abundant Life. One of these statements is false and was made in order to obtain benefits. The Court concludes that the second statement is a true statement. The earlier statements that Dr. Klinefelter did not supervise anyone are not accurate and were made with the intent to defraud. Although the Defendants suggested that the term "supervisor" is capable of being understood differently in certain circumstances, the Court does not

believe it could be misunderstood in the context of the sole physician and the sole nurse practitioner at a medical clinic.

The Court further concludes beyond a reasonable doubt that the Defendants engaged in the scheme with the intent to defraud. The Defendants were aware that SSA accepts at face value the statements of the applicant or his representative. They could at any time have corrected any "mistakes" if that is how the Defendants classified the misrepresentations and false statements.

The Government proved beyond a reasonable doubt that Defendants acted knowingly with the intent to deceive to gain money and cause the loss of money to SSA. Given the number of statements that were inconsistent with Dr. Klinefelter's work activities, there is no question that Defendants acted knowingly. It is impossible to conceive of any other basis for the Defendants' actions other than an intent to defraud. Based on the amount of time that elapsed between the initial application for disability benefits and the determination that Dr. Klinefelter was not entitled to benefits, the Defendants' suggestion that this could have derived from a mistake,

computer error or some other innocent reason simply is not plausible.

The Government proved beyond a reasonable doubt that the scheme to defraud involved a materially false or fraudulent pretense, representation or promise. It involved a number of false representations or promises.

A materially false or fraudulent pretense, representation, or promise may be accomplished by an omission or the concealment of material information. See Seventh Circuit Federal Jury Instructions, P. 218, 18 U.S.C. § 1343. The extent of Dr. Klinefelter's involvement with Abundant Life was material. The evidence establishes that both Defendants minimized what Dr. Klinefelter was capable of doing. Because Dr. Klinefelter was the only physician associated with Abundant Life during the time alleged in Count I, he necessarily was making management decisions. He was supervising Mrs. Klinefelter. Mrs. Klinefelter could not have malpractice insurance without Dr. Klinefelter. The false statement that Dr. Klinefelter had nothing to do with Abundant Life after December 31, 2002 was material in that it was designed to obtain benefits. It was also material whether Dr. Klinefelter saw any patients, earned any income or made any

decisions in connection with the business. Because the scheme to defraud was premised on a number of materially false or fraudulent pretenses, representations or promises, in addition to omissions and the concealment of material information from March of 2004 to January of 2008, the Court concludes this element is satisfied.

The Government proved beyond a reasonable doubt that Defendants caused interstate wire communications to take place in the manner charged in Count I.

A wire transfer of funds constitutes transmission by means of wire communication. See Seventh Circuit Federal Jury Instructions, P. 220, 18 U.S.C. § 1343. As reflected in Government's Exhibit 1Y, Dr. Klinefelter received funds by means of wire transfer from the SSA in Baltimore, Maryland, during the months he received disability benefits.

Based on the foregoing, the Court concludes that the Government has proved each element beyond a reasonable doubt. Accordingly, the Court finds Defendant Vernon Klinefelter Guilty of Wire Fraud, in violation of 18 U.S.C. § 1343. The Court finds Defendant Geraldine Klinefelter Guilty

of Wire Fraud, in violation of 18 U.S.C. § 1343.

III.

Defendants Vernon and Geraldine Klinefelter are charged in Count II with Concealment/Failure to Disclose the occurrence of an event affecting Defendant Vernon Klinefelter's initial and continued right to disability insurance benefit payments.  Specifically, it is alleged that beginning in approximately March of 2004 and continuing to approximately January of 2008, the Defendants concealed or failed to disclose Dr. Klinefelter's medical condition, his work activity, and his income to SSA with the fraudulent intent to secure payment either in a greater amount than was due or when no payment was authorized.

In order for the Court to find the Defendants guilty of this charge, the Government must prove each of these elements beyond a reasonable doubt: (1) The Defendant had knowledge of an event affecting Dr. Klinefelter's right to receive or to continue to receive payments; (2) The Defendant knowingly concealed or failed to disclose this event to SSA; and (3) The Defendant concealed or failed to disclose this event with the intent to

fraudulently secure payment of social security disability benefits in an amount greater than was due or when no payment was authorized.  See 42 U.S.C. § 408(a)(4); United States v. Phythian, 529 F.3d 807, 812 (8th Cir. 2008).[4]

Much of the evidence that proved beyond any reasonable doubt the Defendants were guilty of wire fraud also establishes their guilt as to concealment/failure to disclose.  The Defendants knew they had a continuing obligation to inform the SSA of changes in Dr. Klinefelter's condition or his ability to work.  The evidence established one of two things: Dr. Klinefelter's medical condition did not preclude him from working more extensively than SSA believed, based on representations from the Defendants; or Dr. Klinefelter was able to work because his conditions were controlled by medications.  Whatever the case, during the applicable time period, the Defendants knowingly made a number of false statements

---

[4]The Government submitted this as a proposed instruction on Count II. The Defendants objected to the instruction on the basis that it was not a Seventh Circuit Pattern Instruction.  The Court determined that it is a correct statement of the law and further noted that Defendants did not submit an alternative instruction.  Accordingly, the Defendants' objection was Denied.

or representations concerning the amount of work Dr. Klinefelter was performing and the nature of this work.

Between March of 2004 and January of 2008, Dr. Klinefelter's medical condition and whether he had stopped working on December 31, 2002, or the extent to which he continued working was relevant to his right to receive or continue receiving social security disability benefits. As discussed in connection with Count I, the Defendants knowingly concealed or failed to disclose facts about Dr. Klinefelter's medical condition, the amount of work he was performing, the nature of this work and his income a number of times throughout the period.

The intent of the scheme was to fraudulently secure payment in an amount greater than was due or when no payment was authorized. If there were fewer examples of concealment or failure to disclose, then the Defendants' assertion that this was a mistake or misunderstanding might be plausible. As previously discussed, however, the record establishes there were multiple instances of the Defendants' failure to disclose facts about Dr. Klinefelter's medical condition, work activity and income during this

nearly four-year period.

In March and April of 2004, Geraldine Klinefelter and Vernon Klinefelter stated that he stopped seeing patients on December 31, 2002, and had not worked since. These statements were made at a time when Dr. Klinefelter was seeing patients–immediately before the March 31, 2004 statement which was affirmed on April 4, 2004, between that statement and Dr. Klinefelter's April 26, 2004 application and immediately after that date. These are just two examples of knowing false statements and representations that were designed to influence SSA's decision. Given the amounts that were billed to Medicare, Medicaid and Blue Cross/Blue Shield and the profits of Abundant Life, there is no question Dr. Klinefelter's income exceeded the threshold in order for him to be eligible for SSA benefits.

The evidence established beyond a reasonable doubt that the result of the scheme to defraud was that SSA provided disability insurance payments to Defendant Vernon Klinefelter and the Defendants' son totaling $107,700.

Upon examining the record, the Court concludes that the Government proved each of these elements beyond a reasonable doubt and Defendant Vernon Klinefelter is guilty of Concealment and Failure to Disclose the occurrence of an event affecting Dr. Klinefelter's initial and continued right to disability insurance benefits. Defendant Geraldine Klinefelter is guilty of Concealment and Failure to Disclose the occurrence of an event affecting Dr. Klinefelter's initial and continued right to disability insurance benefits.

IV.

Defendants Vernon and Geraldine Klinefelter are charged in Count III with Making a False Statement or Representation for use in determining federal benefits. In order for the Court to find the Defendants guilty of this charge, the Government must prove each of the three elements beyond a reasonable doubt: (1) The Defendant made a knowingly false statement or representation as charged in the Indictment; (2) The statement or representation was for use in determining the right to a federal benefit; and (3) The statement or representation was of a material fact. See 42 U.S.C.

§ 408.

There is significant evidence that on December 27, 2004, following a request from SSA for more information, the Defendants made a false statement to SSA in connection with Vernon Klinefelter's March 31, 2004 application for social security disability payments and disability determination.

Government's Exhibit 1O is the Work Activity Report which was completed by Dr. Klinefelter for Abundant Life Medical Clinic. The document is dated December 27, 2004. In describing his present work activities and changes due to illness or injury, Dr. Klinefelter states:

> Was not able to work hardly at all for five months after 10 day hospitalization in Feb. 2003. Worked one or two afternoons per week when able, seeing one to three carefully selected patients. Due to problems with memory and ability to do certain types of analytical thinking, as well as the effects of seizure and pain medications, I did mostly small skin surgeries and joint inj[ections]. I only worked when my wife was available in [sic] any problems arose. It takes much longer to see patients because of problems with concentration.

Dr. Klinefelter claimed he did not make any management decisions after his illness, stating, "My wife, a nurse practitioner, makes any management

decisions related to the clinic."

There was significant evidence that Dr. Klinefelter's statements that he was hardly able to work for five months following a February 2003 hospitalization and that he saw "one to three carefully selected patients" or worked two afternoons per week are false. Evidence such as medical billing records and hospital records establish that the statements were false. Abundant Life billed significant amounts during that time period. Moreover, individuals such as Donna Podeschi and Daniel Raab who regularly interacted with Dr. Klinefelter at the time did not observe anything which caused them to be concerned about his condition. The statement that he saw "one to three carefully selected patients" is false. He was treating patients at St. Vincent Hospital in the months immediately preceding and following this statement. There is no indication these patients were "carefully selected."

The statement that Dr. Klinefelter's wife made any management decisions at that time is also false. As reflected in Government's Exhibit 12, in 2003, the Nurse Practice Act prevented an individual in Illinois from

engaging in advanced practice nursing unless there was a written collaborative agreement with a collaborating physician. See 225 ILCS 65/15-15. The collaborating physician was required to provide "medical direction under an agreement." See 225 ILCS 65/15-15(c). Therefore, Mrs. Klinefelter could not perform her occupation without a physician's supervision.

Karen Schrock, an Illinois Department of Regulations investigative employee, testified regarding these requirements. Although the collaborating physician was not required to be physically present, an advanced practice nurse could not collaborate with a physician who was retired, incompetent or disabled. Accordingly, the statement that Mrs. Klinefelter made any management decisions is also false. She worked under the direction of Dr. Klinefelter and was not authorized to make management decisions.

According to a contemporaneous letter to the SSA signed by Gerry A. Klinefelter, the income earned by Dr. Klinefelter in 2004 would be "approximately $7,000." The letter further provided that "Dr. Klinefelter

worked two afternoons per week and saw two to three patients on average when he was able to work."

Dr. Klinefelter's income for 2004 was significantly more than $7,000. The Abundant Life Clinic could not operate without Dr. Klinefelter. Moreover, the Defendants were billing significant amounts of money to Medicare, Medicaid and Blue Cross/Blue Shield. Abundant Life's income did not belong exclusively or almost exclusively to Mrs. Klinefelter, who could not work as a nurse practitioner except under a collaborative agreement.

The evidence shows that a number of these statements made by the Defendants on or about December 27, 2004 were false or fraudulent. The Court further finds that the reason the statements was made was for use in determining the eligibility for SSA benefits. There is not really any other conceivable reason to make such statements about the nature of Dr. Klinefelter's work. A fact is material pursuant to § 408(a)(3) if it has a natural tendency to influence or was capable of influencing the Government agency or official. See Phythian, 529 F.3d at 813; see also United States

v. Moore, 446 F.3d 671, 681 (7th Cir. 2006) (defining "material statement" under 18 U.S.C. § 1001).[5]  Certainly, a statement that a social security disability applicant was hardly able to work or could only work one or two afternoons a week, in addition to a statement that he did not make any management decisions, would have a natural tendency to influence a Government official determining the applicant's eligibility for benefits.

Based on the foregoing, the Court concludes that the Government proved beyond any reasonable doubt that Vernon Klinefelter and Geraldine Klinefelter knowingly made and caused to be made a false statement and representation of a material fact to the SSA in applying for social security disability payments and disability determination, in violation of 42 U.S.C. § 408(a)(2).

V.

Based on the foregoing, the Court finds as follows:

---

[5]The Defendants objected to this instruction on the meaning of "material" in connection with Count III, on the basis that it is not a Seventh Circuit Pattern Instruction.  The Court determined this instruction is a correct statement of the law.  Moreover, the Defendants did not submit an alternative instruction.  Accordingly, the Defendants' objection is Denied.

The Court finds the Defendant, Vernon Klinefelter, <u>Guilty</u> of the Offense of Wire Fraud, as Charged in Count I of the Indictment.

The Court finds the Defendant, Geraldine Klinefelter, <u>Guilty</u> of the Offense of Wire Fraud, as Charged in Count I of the Indictment.

The Court finds the Defendant, Vernon Klinefelter, <u>Guilty</u> of the Offense of Concealment/Failure to Disclose, as Charged in Count II of the Indictment.

The Court finds the Defendant, Geraldine Klinefelter, <u>Guilty</u> of the Offense of Concealment/Failure to Disclose, as Charged in Count II of the Indictment.

The Court finds the Defendant, Vernon Klinefelter, <u>Guilty</u> of the Offense of Making a False Statement, as Charged in Count III of the Indictment.

The Court finds the Defendant, Geraldine Klinefelter, <u>Guilty</u> of the Offense of Making a False Statement, as Charged in Count III of the Indictment.

ENTER: May 16, 2014

FOR THE COURT:

s/Richard Mills

Richard Mills
United States District Judge